**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 18-2272

_____

SHENECQUA BUTT; ALLEGRA KING; TANYA
MITCHELL; THERESA HOWARD; ELLEN BRONSON

v.

UNITED BROTHERHOOD OF
CARPENTERS & JOINERS OF AMERICA;
CARPENTERS HEALTH & WELFARE FUND OF
PHILADELPHIA & VICINITY; EDWARD CORYELL;
MARK DURKALEC; PHILADELPHIA HOUSING
AUTHORITY; METROPOLITAN REGIONAL COUNCIL
OF CARPENTERS AND JOINERS OF AMERICA

SANDRA THOMPSON,

            Appellant

_____

No. 18-2273

_____

THERESA HOWARD

v.

PHILADELPHIA HOUSING AUTHORITY;
METROPOLITAN REGIONAL COUNCIL OF
CARPENTERS AND JOINERS OF AMERICA; EDWARD
CORYELL, SR. (OFFICIALLY AND PERSONALLY);
MARK DURKALEC (OFFICIALLY AND PERSONALLY)

SANDRA THOMPSON,
                                                                                            Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court Nos. 2-09-cv-04285; 2-13-cv-00374
Magistrate Judge: The Honorable David R. Strawbridge

_____

Submitted on November 12, 2020

Before: HARDIMAN, SCIRICA, and RENDELL, *Circuit Judges*

(Filed: June 8, 2021)

Sandra Thompson
Law Office of Sandra Thompson, LLC
351 E. Princess Street
P.O. Box 1901
York, PA 17405
    *Counsel for Thompson, Appellant*

2

Ryan M. Paddick
1442 Pottstown Pike, #312
West Chester, PA 19380
    *Counsel for Paddick, Appellee*

―――――――

OPINION OF THE COURT

―――――――

HARDIMAN, *Circuit Judge.*

This appeal involves a dispute over legal fees. The District Court ordered attorney Sandra Thompson to pay predecessor counsel, Ryan Paddick, $54,562.73 from Thompson's portion of a settlement fund. Thompson appealed, raising four arguments. We will affirm.

I

This controversy between attorneys Thompson and Paddick began over a decade ago. In 2009 and 2010, Shenecqua Butt, Theresa Howard, and Ellen Brown (collectively, the Clients), filed separate discrimination cases in the United States District Court for the Eastern District of Pennsylvania against, among others, the United Brotherhood of Carpenters & Joiners of America. After their cases were consolidated for discovery, the Clients suffered an adverse summary judgment in January 2012. Acting pro se, the Clients filed a notice of appeal in this Court.

The Clients then hired Paddick to handle their Third Circuit appeal. The night before the case was scheduled for oral argument, Paddick entered into contingency fee agreements

3

with each of the Clients. Those agreements provided that Paddick would serve as counsel on remand (if any) and promised Paddick a 40 percent fee of any trial or settlement proceeds.

Paddick prevailed in the appeal. Consistent with his agreement with the Clients, Paddick pursued discovery and prepared for trial. Paddick took twenty-four depositions, presented two oral arguments, attended two settlement conferences, and filed nine substantive motions or responses. When it came time to retain an expert witness in March 2015, however, Paddick was unable to advance the necessary funds. Paddick told the Clients: "if this puts you in a position where you feel the need to change counsel, I will cooperate with any new counsel." *Paddick v. Butt*, 2018 WL 1991737, at *10 (E.D. Pa. Apr. 27, 2018).

In April 2015, the Clients terminated their relationship with Paddick and retained Thompson to pursue their claims for a 35 percent contingent fee. Paddick informed Thompson of his labors on behalf of the Clients and told her that "fees remain due on the work [he] did on the cases prior to [her] stepping in." *Id.* at *10. Thompson did not respond. In September 2017, the Clients settled their cases for a total of $380,000, so under her fee agreement, Thompson's share was $133,000.

In October 2017, the District Court acknowledged the settlements and dismissed the Clients' cases with prejudice. About a month later, Paddick moved to intervene in the Clients' cases to enforce an attorney's charging lien against the settlement proceeds. The District Court granted Paddick's motion to intervene, set a hearing date, and ordered Thompson to hold the contested portion of the settlement proceeds in an escrow account "pending resolution of the motion." Dist. Ct.

Dkt. No. 321, at 2. In April 2018, the District Court found Paddick entitled to $54,562.73 for his work and ordered Thompson to pay Paddick that amount in her capacity as custodian of the escrow account. Dist. Ct. Dkt. No. 357, at 1. The District Court's order did not, however, explicitly state whether Paddick's fees were to be paid from the fees paid to Thompson or from the Clients' portion of the settlement fund. Confusion ensued between Thompson and the Clients, so the District Court held a second hearing in May 2018 to resolve the matter. Thompson argued Paddick's fee should not come from her fees but instead should come from the Clients' portion of the recovery.[1] The District Court disagreed and ordered Thompson to pay Paddick's fee from her $133,000 portion.

Thompson filed this timely appeal.

II[2]

Thompson's first (and most substantial) argument is that the District Court lacked jurisdiction to hear Paddick's

---

[1] Thompson's argument led to a Public Reprimand by the Disciplinary Board of the Supreme Court of Pennsylvania. The Disciplinary Board determined Thompson violated seven ethical Rules of Professional Conduct (RPC) related to her representation, including RPC 1.7(a)(2) for acting adversely to her Clients when she "maintained that her legal fees were separate and apart from prior counsel's legal fees." App. 840. Thompson filed this appeal on her own behalf, not as counsel to the Clients.

[2] We have jurisdiction under 28 U.S.C. § 1291 and review de novo the District Court's exercise of jurisdiction. *In re Cmty.*

motions. She claims the Court's jurisdiction "terminated" when the cases were dismissed with prejudice after settlement. Butt Br. 30. Thompson acknowledges that the District Court had the "inherent power to enforce its judgments." Butt Br. 31 (quoting *Peacock v. Thomas*, 516 U.S. 349, 359 (1996)). But she contends that Paddick must seek to enforce his attorney's lien by suing the Clients in state court because the District Court did not retain jurisdiction over the case after it was dismissed and Paddick did not seek to intervene before the dismissal.

We disagree. The District Court had jurisdiction to resolve Paddick's lien motion, but not for the reason it cited (*i.e.*, the supplemental jurisdiction statute, 28 U.S.C. § 1367). As we shall explain, the District Court had ancillary enforcement jurisdiction based on its inherent powers rooted in the common law and unrelated to the statutory grant of authority.

Courts, including this one, have sometimes been imprecise when discussing ancillary enforcement jurisdiction. *See, e.g.*, *IFC Interconsult v. Safeguard Int'l Partners, LLC*, 438 F.3d 298, 309 (3d Cir. 2006) (treating the inquiries for ancillary and supplemental jurisdiction as the same); 13 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3523 (3d ed. 2002) ("Today, the terms 'ancillary,' 'pendent,' and 'supplemental' are all used, essentially interchangeably."). This appeal provides us an

---

*Bank of N. Va. Mortg. Lending Pracs. Litig.*, 911 F.3d 666, 670 (3d Cir. 2018).

opportunity to clear up "needless confusion," WRIGHT & MILLER § 3523, in this area of law.

Unlike the sources of jurisdiction conferred by 28 U.S.C. § 1367,[3] ancillary enforcement jurisdiction focuses on

---

[3] Passed in 1990, *see* Judicial Improvements Act of 1990, Pub. L. No. 101-650, 104 Stat. 5089, § 1367 codified the common law doctrines of pendent claim, ancillary, and pendent party jurisdiction. *Pendent claim jurisdiction* refers to a federal court's power to adjudicate non-federal claims asserted by the plaintiff against the original defendant—over which the court would not have jurisdiction if brought independently—when those claims derive from a common nucleus of operative fact as the federal claim. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 75 (1966). *Ancillary jurisdiction* refers to a court's power to adjudicate a claim asserted by a party other than the plaintiff (usually the defendant)—over which the court would not have jurisdiction if brought independently—when the second claim shares such a close logical connection with the original claim that it may be considered part of the same "transaction." *See Moore v. N.Y. Cotton Exch.*, 270 U.S. 593, 609–10 (1926). Finally, *pendent party jurisdiction* refers to a court's power to adjudicate non-federal claims asserted by a plaintiff against a party other than the original defendant. When the underlying claim over which the court had jurisdiction is based on diversity, the additional party must be diverse; when the underlying claim over which the court had jurisdiction is based on federal question jurisdiction, the additional party need not be diverse. *See, e.g.*, *Finley v. United States*, 490 U.S. 545, 549–52, 555 (1989); *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 558–67 (2005). These

"the power [of federal courts] to enforce their judgments and ensur[es] that they are not dependent on state courts to enforce their decrees." *Nat'l City Mortg. Co. v. Stephen*, 647 F.3d 78, 85 (3d Cir. 2011). It stems from the proposition that "[a] district court acquires jurisdiction over a case or controversy in its entirety and, as an incident to the disposition of a dispute properly before it, may exercise jurisdiction to decide other matters raised by the case over which it would not have jurisdiction were they independently presented." *Id.* (quoting *Sandlin v. Corp. Interiors, Inc.*, 972 F.2d 1212, 1216 (10th Cir. 1992)). Put differently, ancillary enforcement jurisdiction exists "to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 380 (1994). This proposition has been applied consistently for over 200 years. *See, e.g.*, *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34 (1812) (recognizing the contempt power as an "implied power" necessary to a court's

---

three sources of jurisdiction involve the power of federal courts to hear separate *claims*.

Unlike those sources, ancillary enforcement jurisdiction relates to the power of a federal court to exercise jurisdiction over separate *proceedings*. Although not mentioned in § 1367, this common-law doctrine has survived the codification of supplemental jurisdiction and remains independent of the statute. *See, e.g.*, *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 379 (1994); *Peacock*, 516 U.S. at 356; *Nat'l City Mortg. Co. v. Stephen*, 647 F.3d 78, 85 (3d Cir. 2011); *Robb Evans & Assocs., LLV v. Holibaugh*, 609 F.3d 359, 363 (4th Cir. 2010).

proper functioning); *Bank of the United States v. Halstead*, 23 U.S. (10 Wheat.) 51, 53 (1825) ("The authority to carry into complete effect the judgments of the Courts, necessarily results, by implication, from the power to ordain and establish such Courts."); *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395 (1990) (listing proceedings for costs and attorneys' fees as collateral issues "that a federal court may consider after an action is no longer pending").

Nor does ancillary enforcement jurisdiction end when a court renders a judgment on the merits or dismisses a case. As Chief Justice Marshall recognized: "[t]he jurisdiction of a [c]ourt is not exhausted by the rendition of its judgment, but continues until that judgment shall be satisfied." *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 23 (1825); *see also Riggs v. Johnson Cnty.*, 73 U.S. (6 Wall.) 166, 187 (1867) ("Process subsequent to judgment is as essential to jurisdiction as process antecedent to judgment, else the judicial power would be incomplete and entirely inadequate to the purposes for which it was conferred by the Constitution."). "It is well established that a federal court may consider collateral issues after an action is no longer pending," including "motions for costs or attorney's fees." *Cooter & Gell*, 496 U.S. at 395; *see also White v. N.H. Dep't of Emp. Sec.*, 455 U.S. 445, 451 n.13 (1982) (explaining that, even "years after the entry of a judgment on the merits," a federal court may award counsel fees); *Nat'l City Mortg. Co.*, 647 F.3d at 85 (holding the District Court had ancillary jurisdiction after judgment was entered in order to give effect to the remedy it granted).

These precedents lead us to conclude that the District Court had ancillary enforcement jurisdiction over the dispute between Thompson and Paddick. The Supreme Court has indicated that ancillary enforcement jurisdiction extends to

attorney fee disputes. *White*, 455 U.S. at 447–48, 452, 454 (resolving a post-judgment motion for attorney's fees under 42 U.S.C. § 1988 more than four months after the parties settled the case and the district court approved a consent decree); *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 170 (1939) (holding that because a petition for fees is "an independent proceeding supplemental to the original," the suggestion "that it came after the end of the term at which the main decree was entered and [is] therefore too late" was unavailing). Numerous federal courts have recognized the same. *See, e.g.*, *K.C. ex rel. Erica C. v. Torlakson*, 762 F.3d 963, 968 (9th Cir. 2014) ("There is no debate that a federal court properly may exercise ancillary jurisdiction over attorney fee disputes collateral to the underlying litigation." (internal quotation omitted)); *In re Austrian & German Bank Holocaust Litig.*, 317 F.3d 91, 98 (2d Cir. 2003) (same); *Zimmerman v. City of Austin*, 969 F.3d 564, 568 (5th Cir. 2020) (same); WRIGHT & MILLER § 3523.2 ("One of the best-established uses of ancillary jurisdiction is over proceedings concerning costs and attorney's fees."). As discussed, jurisdiction over attorney fee disputes continues after the resolution of the underlying case.

This Court has addressed the role of ancillary enforcement jurisdiction in the realm of legal fee disputes on several occasions, most importantly in *Novinger v. E.I. DuPont de Nemours & Co.*, 809 F.2d 212 217–18 (3d Cir. 1987), and *In re Community Bank of Northern Virginia Mortgage Lending Practices Litigation*, 911 F.3d 666, 671–74 (3d Cir. 2018). In *Novinger*, we upheld the district court's exercise of ancillary jurisdiction over a fee dispute between a client and the client's former counsel following a settlement agreement in the client's underlying case (but before the district court had approved the settlement and dismissed the action). *Novinger*, 809 F.2d at

213, 217. Because the former counsel was attempting to obtain a portion of the client's fund, the underlying case could not be fully resolved without a determination as to the fees. Federal courts, we noted, have a "vital interest" in resolving fee disputes in such a case "because they bear directly upon the ability of the court to dispose of cases before it in a fair manner." *Id.* at 217. The district court's ability to enforce and effectuate the settlement agreement, then, "necessarily includes the power to resolve disputes with respect to the payment of attorneys' fees and expenses." *Id.*

Thirty years later we circled back to a question left unresolved in *Novinger*: whether "ancillary jurisdiction extends to the resolution of a post settlement fee dispute between two attorneys, only one of whom was attorney of record." *Id.* at 218 n.4. We held ancillary jurisdiction did not exist. *In re Cmty. Bank*, 911 F.3d at 672. That was because the district court "ha[d] no control over the [settlement] funds" and "the fee-splitting dispute ha[d] no impact on the timing or substance of the litigants' relief in the underlying case." *Id.*

This case differs from *In re Community Bank* in meaningful ways. Most notably, both Paddick and Thompson were counsel-of-record to the Clients. Another significant difference is that the District Court here has control over the disputed funds. It first ordered Thompson to maintain "[t]he contested portion" in an "escrow account pending resolution of the motion," Dist. Ct. Dkt. No. 321, at 2, and later ordered Thompson, "[a]s custodian of the escrow account," to release the funds to Paddick, Dist. Ct. Dkt. No. 357, at 2. And because Thompson argued then (and now) that Paddick's fees must come from the Clients' portion of the settlement fund, the resolution of the fee dispute could have "impact[ed] . . . the timing or substance of the litigants' relief." *In re Cmty. Bank*,

911 F.3d at 672. Had the District Court agreed with Thompson that any fees due to Paddick were to be collected from the Clients' share, they would have received roughly $54,000 less. Such a reduction would have had a significant impact on the Clients' relief.

Given the abundance of caselaw supporting the application of ancillary enforcement jurisdiction to attorney's fee disputes—even after disposition of the underlying case where jurisdiction was not explicitly retained—we hold the District Court did not err in exercising such jurisdiction over this fee dispute that was raised for the first time after dismissal of the underlying case but was necessary to effectuate the Court's judgment.

### III

Having concluded the District Court properly exercised jurisdiction over the fee dispute, we turn to the merits of Thompson's remaining arguments. The District Court correctly addressed each at length in its thorough and well-reasoned opinion. *See Butt*, 2018 WL 1991737, at *2–21.

### A

Thompson claims the District Court erred when it awarded Paddick fees because the doctrines of duress and unclean hands bar him from any recovery. We disagree.

### 1

Thompson's duress argument is based on the notion that the Clients signed contingency agreements with Paddick only after he approached them the night before their Third Circuit argument and threatened to not appear. According to

Thompson, "perceiving the impending threat and danger to their appeal," the Clients "were induced into retaining Paddick." Butt Br. 33. These facts render the agreements void, Thompson claims.

The District Court rejected this argument, finding the Clients failed to produce clear and convincing evidence of "a wrongful act or threat by [Paddick] that left the [Clients] no reasonable alternative." *Butt*, 2018 WL 1991737, at *5 (quoting *Seal v. Riverside Fed. Sav. Bank*, 825 F. Supp. 686, 695 (E.D. Pa. 1993)). The Court pointed to evidence of a positive relationship between the Clients and Paddick after the Third Circuit argument. It also emphasized that the Clients did not exercise their rights to terminate their agreements with Paddick until over two years after signing them. Finally, after weighing conflicting testimony from the Clients and Paddick as to Paddick's alleged threat to not appear for oral argument, the Court found "Paddick's testimony on this point more credible than that which was offered by the Former Clients." *Id.* at *6. Because these factual findings were not clearly erroneous, *see Fields v. Speaker of Pa. House of Reps.*, 936 F.3d 142, 149 (3d Cir. 2019), we agree with the District Court that Thompson failed to establish duress by clear and convincing evidence. *Cooper v. Oakes*, 629 A.2d 944, 948 (Pa. Super. Ct. 1993) ("The proponent of avoiding the agreement then bears the burden of proving . . . duress by clear and convincing evidence." (emphasis omitted)).

2

Even if the agreements were valid when entered, Thompson argues, Paddick is still barred from quantum meruit recovery under the doctrine of unclean hands. Thompson provides a laundry list of alleged missteps Paddick made at

various stages of his representation of the Clients. *See* Butt Br. 34–40. Considered together, Thompson asserts, Paddick's failures bar recovery of fees.

As the District Court aptly noted, "inadequacy in [Paddick's] representation of the [Clients] goes to the amount of quantum meruit recovery." *Butt*, 2018 WL 1991737, at *14 (quoting *Mulholland v. Kerns*, 822 F. Supp. 1161, 1170 (E.D. Pa. 1993)). Without "convincing evidence that Paddick ha[d] committed illegal acts in his representation of the Former Clients," Paddick was not barred from reasonable compensation for the value of his services. *Id.*

Paddick may not have provided the Clients flawless representation. But his acts do not constitute unconscionable conduct such that recovery should be precluded. *See, e.g.*, *In re Est. of Pedrick*, 482 A.2d 215, 222–23 (Pa. 1984). We agree with the District Court that any such shortcomings in performance go to the amount he deserves under the equitable doctrine of quantum meruit. Imperfect representation does not necessarily bar Paddick from recovery.

B

Thompson's fallback position is that even if Paddick is entitled to fees, they must be paid from the Clients' share of the settlement fund. Under her contingency fee agreement with the Clients, Thompson "limited her liability as substituting counsel for any of Paddick's actions or inactions." Butt Br. 42 (emphasis omitted). Thompson cites the language in her agreements—coupled with the fact Paddick filed his motion against the Clients instead of Thompson—to show that Paddick's fee cannot be taken from Thompson.

In a separate order and opinion following a hearing, the District Court rejected Thompson's argument, holding that the fees must come from Thompson's $133,000. *See Paddick v. Butt*, 2018 WL 2359401 (E.D. Pa. May 24, 2018). "The consequence of what Thompson would like us to do," the District Court wrote, "would leave her clients with just over . . . half (51%) of their settlement proceeds." *Id.* at *5. Relying on a Massachusetts Supreme Court case as persuasive authority, the District Court held that Thompson's request was "manifestly unjust," *id.*, because a client "*should never be made to pay twice*," *id.* (quoting *Malonis v. Harrington*, 816 N.E.2d 115, 123 (Mass. 2004)) (District Court's emphasis).[4]

For the reasons set forth in the District Court's thorough opinion, we will affirm the Court's order that Paddick's fees must come from Thompson's portion of the settlement fund.

C

Thompson's final argument—that Magistrate Judge Strawbridge "abused his discretion in failing to recuse himself," Butt Br. 46—also fails.[5] Thompson made many accusations of partial behavior in her motion for recusal (and

---

[4] The District Court expressed a similar view during the hearing. *See* App. 748 ("It is inconceivable to me that any prudent lawyer would not expect that there's a possibility of an attorney lien coming and if there's an attorney lien coming [you must] calculate that [when negotiating your fee].").

[5] In May 2017, the parties consented to proceed before United States Magistrate Judge David Strawbridge. *See* 28 U.S.C. § 636(c)(1).

the accompanying affidavit and brief). On appeal, Thompson focuses on three examples of alleged bias by Magistrate Judge Strawbridge: (1) on a phone call with Thompson and counsel for one of the defendants, he "offered reasons why he was 'frustrated' with Thompson"; (2) he "strongly suggested to Thompson that Paddick would recover [on Paddick's lien] and it would come from her fee"; and (3) he "acted as former clients' advocate throughout the [lien] hearing." Butt Br. 46–47.[6] When considered together, Thompson concludes, Magistrate Judge Strawbridge's "impartiality might reasonably be questioned" so recusal was required under 28 U.S.C. § 455(a). Butt Br. 47.

The District Court, relying heavily on the Supreme Court's decision in *Liteky v. United States*, 510 U.S. 540 (1994), disagreed, holding that no "reasonable observer considering the totality of the circumstances would believe that the Court was acting based upon bias, prejudice, or any other improper motive." *Butt*, 2018 WL 1991737, at *21. Our independent review of the record revealed no evidence of bias by Magistrate Judge Strawbridge. The negative comments he made reflected his views on the merits of Thompson's arguments, not prohibited bias.

As to the first allegation—that the judge expressed frustration with Thompson—the District Court correctly noted:

---

[6] In her Reply Brief, Thompson claims the Court "acted as Paddick's advocate against former clients." Reply Br. 19. Regardless of whether Thompson believed the Court was serving the Clients' or Paddick's interests (or both), her common refrain is that the Court was acting against her interests.

"judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel . . . ordinarily do not support a bias or partiality challenge," *Liteky*, 510 U.S. at 555, and do not support such a challenge here. Thompson's second allegation—that the Court suggested Paddick would recover his fee from Thompson—is likewise not grounds for recusal. "[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion." *Id.* A remark as to the perceived strength of the case after a day of testimony would not, to a reasonable observer, "reflect[] a fixed or immovable view about the merits of Paddick's request for a counsel fee." *Butt*, 2018 WL 1991737, at *20. Finally, Thompson's claim that Judge Strawbridge acted as counsel *against* her when he questioned witnesses is equally unavailing. "A judge's ordinary efforts at courtroom administration" are "immune" from a recusal challenge. *Liteky*, 510 U.S. at 556.

The District Court accurately described the governing law set forth in *Liteky* and correctly applied it here. The Court did not abuse its discretion when it denied Thompson's recusal motion. *See Edelstein v. Wilentz*, 812 F.2d 128, 131 (3d Cir. 1987).

\*　　\*　　\*

For the reasons we have explained, the District Court had ancillary enforcement jurisdiction over the fee dispute between Paddick and Thompson. And because Thompson's other claims lack merit, we will affirm the judgment of the District Court.